The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit, Oyez, Oyez, Oyez. All persons having a matter of form of business, for the Honorable, the Judges of the United States Court of Appeals, I'd like to give their attention for the Court is now sitting. The Honorable Court. Good morning, Counsel. Good morning. Good morning, Your Honor. Welcome to the Fourth Circuit. Thank you so much for your being here in these technical environment, and we appreciate it. It's not always easy, but we appreciate your being here and look forward to your argument. Today on the video, we have Judge Nehemiah, Judge Nguyen, Judge Diaz, Judge Floyd, Judge Thacker, Judge Richardson, Judge Quattlebaum, Judge Rushing. Joining us by telephone are Judges Wilkinson, Mott, King, Agee, Keenan, and Harris. So, Counsel, obviously the judges who are by phone don't have the benefit of waving their hands, so we ask that you listen attentively while you focus on your argument, of course. When you hear the judge give his or her name, you're about to ask a question, we'll ask that you will stop, listen to the question, and address that question, and we'll try our best to be as orderly and intense and purposeful as we can. With that, we'll call the first case. Counsel Lau? Good morning, Mr. Chief Judge, and may it please the Court. My name is Jamie Lau on behalf of the petitioner, Ronnie Wallace Long. On May 10, 1976, 44 years ago this coming Sunday, Mr. Long was arrested and later convicted based on an unreliable identification. Mr. Long has always maintained his innocence. The issue before this Court is the materiality of suppressed evidence that, one, provided affirmative exculpatory evidence pointing to someone other than Mr. Long as the assailant, two, significantly undermines the case presented by the prosecutor, and three, reveals a concerted effort by law enforcement to hide the evidence from both the prosecutor and defense. This law enforcement effort included manufacturing a false police report and testifying falsely about what physical evidence police had collected and tested. The state judge found that this evidence was immaterial. Judge Thacker's dissent from the panel majority correctly points out why the state judge's Supreme Court precedent and unreasonable under Supreme Court precedent. And on the basis of 28 U.S.C. 2254, these is properly before the federal court to decide on the merits. Judge Thacker, I have a question. Could you explain how this case is different from Wetzel, if at all? Well, it's different from Wetzel because the Supreme Court has explicitly said that the favorability assessment is critical to the materiality assessment. In both Strickler v. Green, Kiles v. Whitley, note 10 of Kiles, it says that the essence of the materiality assessment is whether the favorable evidence would have had an impact on the case. Here, the magistrate judge and district court both agree that the court erroneously considered the favorable evidence. So given the fact that it erroneously considered the favorable evidence, in fact it held that there wasn't a single item of evidence suppressed that was in any way favorable to Mr. Long, and in fact that much of it was even more favorable to the state. Judge Thacker again, so on this record, do you believe the record as it stands shows actual innocence or do you need further discovery? My position is that the record as it stands is sufficient to demonstrate actual innocence, and I'll say specifically why after I go on to say, but before that I want to go on to say that if the court disagrees that the record as it stands meets the standard that's outlined in 28 U.S.C. 2244 B2B, the case should be remanded back for discovery that's needed because the state continued to withhold evidence during the 2008 state court proceedings. But here's why I believe that the standard has already been met. First, suppressing the evidence prevented Long from presenting affirmative exculpatory evidence demonstrating that someone else was the assailant, not Mr. Long. A suspect's hair was collected from the scene, fingerprints were collected from the scene, matches were collected from the scene. They were all tested and none of them were similar to Long. The fingerprints didn't match Long. The hair was collected. It was determined to be a reddish hair of Negroid or Mongolian language. Those are the classifications from the State Bureau of Investigation, not my classifications. That hair that was from Negroid or Mongolian origin was compared to hair standards of Mr. Long's and did not match. That hair was consistent with the identification made by the victim when she described her assailant as yellow or light-skinned, which Mr. Long is not. So reddish hair of Negroid or Mongolian origin was collected from the scene, compared, and didn't match Long, which points directly to someone else. Again, there were 43 fingerprints that were collected that didn't match Long or the victim, pointing to someone else. I'm sorry. With regard to the fingerprints, have you dismissed your exhausted Brady claims based on the fingerprint evidence? And if so, how would you plan, how could you use those? Well, the fingerprint evidence is directly relevant to the assessment under 2244B2B. And it's in the record presently with respect to the joint appendix at 14, I believe it's 1482 or 1481, discussing how those fingerprints were compared and did not match Long. However, the existence of those fingerprints was concealed during the state court evidentiary hearing. So even during the proceedings in 2008, those fingerprints weren't disclosed that they were in the custody of the Concord Police Department. There was actually testimony provided there that was false, that they had no remaining evidence in the case. And subsequently, it was learned that those fingerprints have been compared to other suspects whom no one has ever heard those names before. Are we talking about the 43 fingerprints that were taken from the scene? The 43 fingerprints are in the custody of the Concord Police Department and have been compared to alternative suspects whose names were only disclosed to Long for the first time after the 2008 state court proceedings there before this court. Counsel Judge Hamer has a question. It seems to me that our court is not well equipped to assess all these facts that you're guilt. It seems to me our role is a little more limited, isn't it? And my question is, how do we handle the MAR court's finding, factual finding that, quote, there is no chance of a different outcome, end quote. It seems to me that our question is whether the MAR court acted reasonably, not whether we agree or not, or not whether we conduct a new analysis. And I'm a little troubled by our getting bogged down in a comprehensive assessment of the facts and conducting what the state courts should have done. Our role is quite limited, isn't it? And but my question really is, how do we handle the MAR court's finding that there was no chance? That was the court's word, no chance of a different outcome. What you're speaking of is the no impact determination in paragraph 14 on page 1359 in the record. And that finding was expressly based on the findings of facts and inclusions of law that preceded it and is outlined in nearly every paragraph preceding it that applies an erroneous standard with respect both to favorability and materiality. So the no impact assessment is clearly erroneous and unreasonable under existing Supreme Court precedent. Kyle's requires that the court consider all the ways under a totality of circumstance review that the evidence would have been beneficial to Long. Here, the court didn't find a single manner in which the evidence was beneficial. So the no impact conclusion is an erroneous conclusion that's contrary and unreasonable. The evidence in this case is favorable to Long, not only because, as I explained in response to Judge Thacker's, the evidence is favorable to Long, not only as I described in response to Judge Thacker's, it's positively exculpatory pointing to another suspect, but it also significantly undermines the case presented by the prosecutor. The prosecutor argued that every single piece of evidence, physical evidence collected in this case, unerringly supported the victim's testimony and Long's guilt. That's untrue. Several pieces of evidence was collected, that material was suppressed, and Long couldn't benefit from that material at trial to counter the evidence presented by the prosecution. Second, the prosecutor argued that the law enforcement officers in this case were perfectly and totally honest. We now know that law enforcement officers perjured themselves during the course of their testimony. Between pages 410 and 415 of the Joint Appendix, Officer Van Eisenhower repeatedly perjures himself with respect to the handling of evidence, the testing of evidence, and tells affirmatively to the jury that the only thing tested was a latent shoe print that was compared to a latent shoe print taken from the scene. That was false. Um, on page 335 of the Joint Appendix, Detective Taylor is testifying, and a fair reading of his testimony was that he can't say whether the matches, in fact, were matched, the matches from the scene or not. He's using the word matches as both a verb and a noun, and if you read the testimony, what he's saying is that there was no comparison done between the matches. That as well is false. There was a comparison and they didn't match, yet he then testifies in front of the jury that they were similar, too, to create the false impression that they were the same matches. The jury heard arguments that if it had the suppressed evidence, it could appropriately consider and weigh. Here, the jury never had an opportunity to weigh that evidence. Additionally, Long would have been able to impeach those officers who were testifying falsely about the evidence they collected, and necessarily, when you're impeaching those officers, you're also impugning the case that was built by those officers. I'm sorry, Judge Thacker, again. I just have sort of a factual question. Did any of those officers testify at the 2008 hearing?  Those officers never testified at the 2008. But more importantly... Ms. Lyle, this is Judge King. I want to get to a more basic question here. Do you accept the proposition that this is a successive claim under 2244? Yes, I do. Or is that issue still on the table? We accept that this is a successive claim under 2244. That's right. And under 2244, we had to... Has this court ever ruled it's a successive claim? This court has never ruled with respect to this successive claim, which goes directly to Congress's purpose in adopting AEDPA. It wasn't to prevent claims that were concealed by the state for 29 years prior to the evidence turned over. It was to prevent the abusive use of RICs by defendants who would hold back claims in capital punishment that state capital defendants faced. That was the harm meant to be addressed by 2244 in the passage of AEDPA. Currently, the state is using it as a shield to hide in the standards that Mr. Long has to prove to demonstrate that his constitutional rights were violated. Here, the evidence is plainly material. And the last thing I wanted to say with respect to the favorability of the evidence was it impugns the investigation. But this case is even worse because there's evidence of bad faith by the investigating officers. On page 1484 of the joint appendix is a police report that comports with the testimony of Van Eisenhower that's undated. It comports with the false testimony of Van Eisenhower. And the creation of this police report was done in a manner to conceal the material within that report from the defendant. You don't have to believe me that the evidence here would have made a difference. The actions of the officers plainly show that the evidence here would have made a difference because if this evidence was meaningless. I'm sorry. And didn't the former prosecutor testify at the 2008 hearings that he was not aware of these tests in this second and actually the first report that was concealed and that if he had been aware, he would have turned it over? Yes, that's accurate. The former prosecutor testified he was unaware that he would have turned it over if he was aware. He testified that the defense didn't receive it from him. Further, he testified with regards to the last piece of favorable evidence that I want to discuss before this court. There was biological evidence taken from the victim on the night she was assaulted and that evidence was transferred to detect or Sergeant Marshall Lee of the Concord Police Department. The record of that evidence stops there. It's nowhere in the files of the Concord Police Department that they had biological evidence in this case. And the only reason Long knows that biological evidence exists in this case is because the hospital still has the record of the transfer to the Concord Police Department. The prosecutor at the 2008 MAR hearing who prosecuted Long testified that had he had that evidence, it wasn't an if, it wasn't a what if, it would have been tested. Officers knew that it would have been tested. And the reasonable inference is that they were worried that had it been tested, it would have come back not too long. And as a result of that, they've taken these extraordinary efforts and their bad faith is further shown by the fact that one, the Concord Police Department's file doesn't have any material in it related to the sexual assault case. But two, even the reports... I'm sorry, I can't hear you, Judge Quattlebaum. I'm sorry. Can you hear me now? I can, thank you. Thank you. Your reference to bad faith, I understand your arguments about that terminology and how it would be used at trial. But from a legal standpoint, do your arguments depend on the finding of bad faith? And if so, in what way? The arguments do not depend on the finding of bad faith. Bad faith is just yet another way in which a jury assessing the 2244B2B standard specifically would know about all these facts in the record and all this evidence that has to be weighed against everything known today, old and new. So it would be another indicator with respect to what occurred in this case. With respect to bad faith, the last thing... Judge Diaz, I'm sorry. Mr. Lowe, if you want to go ahead and finish your answer to Judge Quattlebaum's question, go ahead, and then I'll ask my question. I just wanted to say that the final indicator of bad faith here, there's a false police report, there's the disappearance of any record with regard to the sexual assault case, and the suppressed forensic reports that were suppressed, those also were not in the Concord Police Department's files. Those reports were provided by the State Bureau of Investigation, and there's no record of in the Concord Police Department's file, too. So it appears that at some point in time, I think it's reasonable to infer that they had been there, and at some point in time, they were removed from the Concord Police Department's file. So, Mr. Lowe, as I understand the trial court, the state trial judge's analysis of this case, sort of coloring all of this is his assessment of the experience and abilities of these trial lawyers. He, on more than one occasion, indicated that these were extremely experienced trial defense lawyers who were, in some instances, making strategic decisions as to what should or should not be part of this record. And so by way of example, at paragraph six of his order, he says that prior to trial that these lawyers recognized that it was to their client's advantage to not have certain items of evidence tested because they ran the risk of results inculpating their clients. And he gives an example of the pubic hair that you mentioned, that they knew full well that the state was looking at that and perhaps testing pubic hair because they had retrieved pubic hair and other samples from your client, but that they made the strategic decision not to ask about that and instead to simply be able to argue at trial that the state didn't do this, the state didn't do that, there's no evidence of this, no evidence of that. And so what are we to make of that in the context of this claim now on appeal? Well, I believe it's joint appendix at page 1054. Trial counsel makes clear that they asked about a sexual assault kit and were affirmatively told that one hadn't been collected. So they didn't make any choices or had no idea about the pubic hair of the victim because they were expressly told that a sexual assault kit had not been collected. Additionally, whether they decided not to test some evidence in this case is not their burden to make. If they had known that the State Bureau of Investigation had in fact conducted the test and they proved to be favorable and exculpatory to Mr. Long, that would have been significant evidence undermining the reliability of the identification here. The reliability of the identification, first off, the circumstances itself make it plainly unreliable. However, the jury didn't have information necessary to determine correctly whether or not they viewed it as reliable. The prosecutor argued that this was a case that involved an identification that was corroborated. It's expressly said by the prosecutor during closing that this identification was corroborated. It was not corroborated. The problems with the identification are extreme. The amicus brief filed by the Innocence Project describes the identification as being contrary to everything the last 40 years of social science research has shown us enhances the reliability. But here's why I contend that it's wholly unreliable. The victim was brought wearing a disguise into a courtroom where she herself testifies that she could eliminate most, if not all, of the individuals in that courtroom based on their general appearance. And Long was the only one in the courtroom to have a general appearance. Mr. Lyle, before you get to that, the point you made earlier about the social science evidence and the unreliability of identification evidence, are we to gauge that issue in light of, you know, these sort of modern, relatively recent, maybe not so recent, conclusions about the reliability of that evidence, or are we to gauge it based on what was known at the time of this trial? It can be gauged under the Brady assessment on the basis of what we know presently. There's nothing preventing this court from determining. There's nothing saying that courts have to put their head in the sand and ignore 40 years of research demonstrating how this identification is undermined by what we now know from social science research. But moving on to talk just about the unreliability itself. But just addressing that question, it seems to me that's a good question because the standard isn't an objective standard based on what current standards are, but whether it was a reasonable application of the Supreme Court law of Brady and a reasonable factual determination. It seems to me your argument seems to ignore the heavy burden that has to be carried. This is a very old sentence, and the application of the law at the time is measured by the reasonableness of the way the court conducted itself. I mean, we're not a reviewing court to assess all the evidence again under current standards. We're determining whether the state courts acted reasonably. And I think that's the whole message of Section 2244, isn't it? 2254D is where the standard is outlined for reviewing the materiality assessment. 2244 or 2254D is the burden that the petitioner must carry to demonstrate the constitutional violation. With respect to that standard, it's clear that this evidence would have impacted the trial, and that's what's being looked at under the Brady assessment. The Brady assessment is looking at whether or not, in light of the evidence withheld, the defendant received a fair trial, understood as a trial worthy of a verdict of confidence. Here, the defendant did not receive a fair trial. So that burden is all that has to be established for the constitutional violation. That is the burden that it requires the defendant to lift to present his constitutional claim. Judge Wilkinson, can you hear me? I can, Judge. All right. In the previous appeal here, it was reauthorized, our court authorized the filing of a petition, and I gather there was a general acknowledgement that this was a successive petition. And given that, it seems to me we can argue about the Brady violation all we want, but even assuming that there was a Brady violation, it seems to me you would run up on remand against 2244B2. And in terms of whether we should take all kinds of things, according to modern social science research, the statute reads no reasonable fact finder would have found him guilty of the underlying offense. So that seems to speak to the jury's action at that time and place. My basic problem is I don't understand where the case would go from here. The dissent to the panel opinion said, well, we would want further discovery. We need further discovery. But I don't understand discovery into what? How does it become something other than a fishing expedition? And how do you meet this standard in 2244 when Mrs. Boss, for example, has been dead a number of years. I think she died in 2015. And I worry about any kind of hearing on remand being incomplete, to say the least, without the presence of Mrs. Boss. And so I just don't understand what road the case takes from here because the language in 2244B2, that's the strongest burden of proof I've ever seen expressed in a statute. And where does the case go from here? And how do you overcome the statutory language 2244B2, especially given the fact that Mrs. Boss is now deceased? My time is up, but if I may answer your question. The first thing I would like to say is it's not the strongest burden of proof expressed by statute. That would be a burden to prove beyond a reasonable doubt that Mr. Long is guilty. So necessarily 2244B2 requires looking at whether or not, in light of this evidence, the state could approve beyond a reasonable doubt that Mr. Long is guilty. By that even higher standard, it should be clear on the present incomplete record that the state couldn't have met that burden. Additionally, the reasonable fact finder language, it says no reasonable fact finder. There's no limitation there that I can read or see that says no reasonable fact finder in 1976. And I contend that the cases that analyze these claims, they look towards the reasonable fact finder with regard to the evidence today. Additionally, McQuiggan, this court's decision in Telegese outlines the consideration, and that consideration is all the evidence old and new. And when we're talking about new evidence that's relevant to the case, that would include the social science research. For all these reasons, we ask that this court reverse the district court. What is the hearing going to be like on remand? Are we going to admit all this social science research? Who's going to testify? What are you going to look into? It's very hard, as Judge Niemeyer said, for us to sift through all of this on appeal and make a finding that after looking through all of these facts, we conclude that the standard is met. That's normally for a trial court to do, preferably the state court, but if not, the federal district court. But it's for a trial court to sift through the evidence. And what is the trial court, the federal district court, supposed to do on remand? How are they going to go about this? What are they supposed to do? Well, two things to answer your question. First, the discovery that would be sought would be to fill out the record with the information that was concealed from the defendant about the fingerprints and the alternative suspects that those were compared to after the 2008 proceeding. So that's what the information would be. The second thing is, it's not for a presentation of evidence to determine the facts. We know what the facts are on the case. It's required to weigh those facts under the totality of circumstances and holistic review that are required by both Brady and the McQuiggan and other courts speaking to the 24B2B. The Supreme Court in Kyles tells us how to weigh that favorable evidence. It tells us that we have to take every way in which that evidence tends to be favorable to the defendant, and then the court has to make a determination with respect to how that would influence the reasonable juror. And that's what that would look like today. Thank you, counsel. Mr. Lyle, before you sit down, this is Judge King again. I'm somewhat troubled by Judge Wilkinson's questions in this case, because I think it does make it much more difficult for you that this is, that you say, this is a successive claim. And I asked you that question earlier, and you apparently concede that. I can't find in the record where that issue has been litigated yet. Judge King, I'm— And I'm troubled by your concessions on behalf of your client that it is. Anyway— Judge King, Judge King, I'm— I'm going to make that comment. That's the reason I asked the question earlier. I'm surprised at the answer. Judge King, I'm sorry if it came across that I was saying that this is a successive claim. It certainly is not a successive claim. You said that. You said that explicitly. And if I said that, it was a mistake. This is not a successive claim. This is the first time this claim is being heard by a federal habeas court. This claim didn't arise until after the first habeas petition, because the state continued to suppress the evidence for 29 years before it was finally disclosed. So it certainly is not a successive claim. I will concede that it is the second petition that Mr. Long has filed, but not a successive claim. I'm sorry if I misspoke. For these reasons, we ask that this court reverse the judgment of the district court. Thank you. Thank you, counsel. Mr. Rubin? Thank you, Your Honor. Good morning. May it please the court. Philip Rubin on behalf of the state of North Carolina. It's always a privilege to appear in front of this court, but today, the reason I do so is because of the totality of this record and how it demonstrates that the jury's verdict of guilty would be unchanged by the undisclosed evidence in this case. In saying that, and no way do I intend to minimize today how significant it is when it is found that evidence was not turned over. Your Honors, a case like this does deserve a hard look for all its implications. But as we have given it that hard look ourselves and looked at the facts in their entirety, which I intend to talk about today, it brought us to agreement with the state court's conclusion that the cumulative effect of any items of any value is so minimal that it would have had no impact on the outcome of the trial. It is for that reason that I will ask you to affirm the judgment of the district court. Now, I want to get into some of the more fundamental facts, but I would like to respond to a very specific point because it demonstrates what I think is a problem and that the evidence has not been described in what I would say is a fair way to the court. And I want to talk about what Mr. Lau just said about Mr. Taylor. It may seem like a side point, but he accused Mr. Taylor of perjury. And he directed the court to testimony where he said, Mr. Lau said that he said the matches that were found in the house were a match for what was found in the car. I would ask the court to take a look at that assertion in the context of page 378, which is the page he was talking about. He was on cross-examination. He was asked by the defense attorney about the search of Mr. Long's car. Question, were you looking for matches? Answer, we found, I didn't go there with intentions of finding or looking for matches. Whenever I observed them, I picked them up and observed them as evidence. Why did you see the matches? Because there were matches of a similar nature found in Ms. Bott's home. He was not testifying about scientific testing of the matches. He was directly asked, why did you take those matches out of the car? They looked like the ones in the house. And that was, that was stated to this court this morning and in briefing as perjury. Because, this is Jess Thacker. To be clear with regard to the matches, none of the five match books that were taken from the house matched those in the, I'm sorry, they were eliminated as possible origins of the burned matches in the victim's home, correct? No, ma'am. Four of the five were excluded based on color. One of them could not be excluded. The agent noted in his hand that it probably did not originate from this match book. That is KA-1463. That's right. He said probably, and his testimony was, I could not conclude that they did. That was his testimony at the state MAR hearing about his analysis. To be clear, none of the five match books conclusively, could be conclusively connected to this crime? That is correct, Your Honor. Okay, so nothing on the match book. Was there hair evidence? There was a, labeled as a suspect hair that was found, and it was not able to be matched to Mr. Long, Your Honor. Did the jury know that? No, Your Honor, but the testimony- Did they know that? The testimony at the MAR hearing was that they did not, Your Honor. Your Honor, may I please, may I address that evidence, though? Because the question you are asked to examine- Actually, just address, please, for me, what evidence the state, which is perhaps what you were going to say, what evidence the state had that you say, in the totality of the circumstances, would have swayed the jury such that this would have been unchanged? What was the evidence? I'd like to take a moment to lay it out for you, Judge Jackford, to really answer this question. Because the petitioner has asserted that there was no physical evidence that ties into the crime, and that is not true, and it's not true in a couple of ways. But I want to put it all in context, because you don't just have a witness ID and an arrest and a trial and a verdict. What you have- Before you do that, can you just tell me, can you just list what the physical evidence is that tied this, without all of this background, just the three things and then, or whatever it is, and then you can go into the background. What is the physical evidence that you want to talk about? The physical evidence is the jacket, the toboggan, the gloves, and this class-matched shoe print. Now, let me please put that in context. Because Mrs. Boss, she told police on the day of the rape, April 25th, 1976, she described all of those items, not the shoe print. She described, she gave his physical description, and she said he was wearing a black leather- What did, how did she describe him? How did she describe him? She described his facial hair. She described, yes, and she did, Your Honor, I know there was a dispute about that at testimony, but both she and Detective Taylor testified that from the beginning, she had always stated that he had a small mustache and something that kind of looked like a beard, some hair on the side- And what was his skin complexion that she said immediately following the rape? She described his complexion as light, and she also- And is Mr. Long's complexion light, or is he dark-skinned? Your Honor, it's a subjective determination that Mrs. Boss was giving, and I want to put, I want to have the opportunity to put this in context, because she used that description when she picked him out in court on May 10th as part of how she knew that Ronnie Long was the person. So she said, this person that I just picked out, part of how I know it was him is, and she said, I will never forget his profile, the coloring of his skin, it was light, not colored real dark. That was on May 10th when she was looking at him, or right after she had looked at him. So we might disagree, and we might say that her assessment of the tone of his skin, but it is a point of reference that she made. And more than that, Your Honor, if that is such a clear smoking gun, it's interesting that the jury had this in front of them. And the defense attorneys, who I don't think anyone disputes are very skilled, the defense attorneys didn't even argue that point in closing. They did not argue that Mr. Long did not match the physical description that Mrs. Boss gave. They did not make that argument. You can look at the entirety of both defense attorneys' closing arguments, and given the thoroughness of those arguments, I have to think they would. And we are not here. We can't see Mrs. Boss' testimony. We can't see Mr. Long's. Okay, so you were talking about the totality of the circumstances, and you start with the victim's identification, which you concede there's some disparity. What next? I did not concede that, Your Honor, no. And I would like to begin with the order in the timeline. Because what she said was on April 25th, she gave this description, including the clothing. Then she's given a lineup of 13 African American men of a similar age group in the hospital. How many were wearing a leather jacket in that lineup? I don't think it's known, but there's no assessment of whether they were or not. I don't believe it's known. I think there was one wearing a leather jacket in that lineup. I could be incorrect. No, ma'am. No, ma'am. She did not pick, I don't recall that fact, but she did not pick anyone from that lineup. And Mr. Long wasn't in it. That lineup, she didn't pick anyone. I think you may be thinking of a later lineup, Your Honor. Okay, in the later lineup, did she pick Mr. Long out in the later lineup? After she had picked him out from the courtroom, she picked him out in the lineup. And in that later lineup, how many people were wearing the leather jacket? He was the only one in that. Okay, all right, carry on. He was not wearing the leather jacket, Your Honor. And our computer just locked itself, so if you will excuse me for a moment while I unlock it. My apologies for that. Returning to this timeline, and it matters, and I would ask for the opportunity to put this before the court, and to put all of it before the court, so that you can hear. Mr. Rubin, excuse me, this is Judge Keenan. When you're putting this all in front of the court, please don't ignore what I see to be the elephant in the room here. Detective Eisenhower lied on the stand. He did perjure himself. He said those items, the 13 items that he hid from the second manufactured report, he said that they were in his custody the entire time. It's undisputed they were not. They were ultimately tested. So we know that we have a detective in this case who took an oath and lied under oath. So would you please weave that into your explanation of why that doesn't radically affect the MAR Court's materiality determination? Thank you, Judge Keenan, and I promise I will weave it into this, and I think that is an important point to talk about. But when we look at the evidence, she gave this description the night of the rape, and has always given the same description involving the black jacket, the toboggan, and the gloves. And then she does the hospital lineup, doesn't pick anyone, Mr. Long's not in it. Then she identifies him on May 10th in court based on the description she'd given, based on his walk, based on his voice. And I would note in that he was not wearing a black leather jacket. He was wearing a brown jacket. She wasn't even sure what material it was. But he was not wearing the same clothing. It wasn't a clothing-based identification. It was actually an identification that meets a lot of the modern standards that didn't exist back then. The police officers were separate. She was expressly told, you are not going there to pick someone who is in the courtroom. You are going there to see if the person who attacked you happens to be there, and he may not. So don't just pick someone. And so she picked him. Then they did a confirmation lineup back at the police station where she picked him out. And I agree, Judge Sacker, in that one, he was the only one wearing a jacket. That's true. But that was merely a confirmation lineup. If she picked someone different 20 minutes later at the police station, that would be a problem. But that confirmation lineup was never directly even talked about to the jury. And so then they bring Mr. Long in, and they search his car. What do they find? They find black leather gloves. They find the toboggan that she says is a match. They find he's wearing the jacket. It wasn't in his car. And then when they search the house, they've done the testing in the house, they find a shoe print up high on a column, and the perpetrator climbed in through a window. And I don't think anyone's really argued that that shoe print is unlikely to be the perpetrator. And it was found to be a class match. Not a perfect, we can exclude every other shoe in the world, but that tread design matched the tread on his shoes. And so that is the physical evidence laid out. Now, Judge Keenan, I don't want to- Wait, sorry. You're finished with your description of the physical evidence? Before you go on to address Judge Keenan's question, you said the jacket, the toboggan, and the gloves were the physical evidence, along with his shoe print that couldn't conclusively be determined to be his. The jacket, was there any indication from the SBI lab report that that jacket had any evidence from the crime scene on it? Any hairs or carpet fibers or anything? No, ma'am. It didn't have any at all, actually. It had a trace of marijuana- All right, any on the toboggan? There were fibers that didn't match the house on the toboggan. Didn't match the jacket, I mean, didn't match the- Yeah, didn't match the jacket, didn't match the toboggan. Now, your third physical evidence was gloves. Was there any evidence that matched the crime scene on that? No, ma'am. There was nothing that matched it, but I would like the opportunity to point- What if the jury had heard that? What if the jury had heard that there was some inconsistency in the identification that there was no physical evidence on the jacket, or the toboggan, or the gloves, or the paint, or the fibers, or the 43 fingerprint? What if the jury would have heard that? Do you not think that would have impacted the results? Your Honor, you're required under Kyle's and all of the cases on Brady to assess, and Colin B. Penholster says this directly, to assess not just the evidence, if it had been turned over, but also the state's response. So yes, if that had been brought in front of the jury, what would have happened next? What would have happened? You don't have to guess, because you can look in the joint appendix at page, it's around 1230, 1230, 1231. Agent Cohn, who tested the jacket, explained his findings on the jacket. And he said it wasn't significant. He rarely ever finds evidence like that on a leather jacket. And in fact, he found no fibers. He didn't find fibers, for example, from Mr. Long's car, which we knew he drove the day that the jacket was taken off of him. So I guess he wasn't in his car, except we know he was. They didn't find fibers from the police station. They didn't find any fibers. And what he explained was, 15 days is a long time, especially for a leather jacket to be uncontrolled. And it was April 25th through May 10th when that jacket was unaccounted for. And so he testified that that was not significant evidence. Now, people can disagree with that, but the state would have brought that evidence. Detective Eisenhower said it. Didn't he testify that it remained in his custody the entire time? He did. And I would like now to address that point. Certainly, what Detective Eisenhower said there was not correct. And was it a lie? It could have been. I'm not going to argue to you that it's not possible that he was. But the defendant has argued perjury here. And has said that this was intentional. I'd like you, I've asked the court to consider looking at that testimony. It was bringing the leather jacket into evidence. And he did say it was in my custody and control the whole time. Unless he has an unreasonably broad definition of custody and control, that is not true. Did he misremember? Was he trying to hide something? Was he trying to keep things simple in court? I don't know the answer to that. You do know that the answer is the testimony was incorrect. Is that right? At least I would agree with that. Yes, Your Honor. And Detective Eisenhower did not testify at the 2008 hearing, correct? That's right. He was described by the petitioner as a fairly critical witness. And then they elected not to call him. And Your Honor, that's crucial because they are now making a case that's almost. Detective Eisenhower, was he still on the Concord Police Department in 2008? No, ma'am, he was not. When did he leave? The only, I don't know when he left. The reason I know that he was not is that he lived in Georgia at the time, because they needed out. This is, and I'd ask the court to look at this in the transcript. At page 847, the petitioner had filed a motion seeking for out-of-state service of process to call him to testify. And then the court says, and this is by page, and she calls him a fairly critical witness. By page 887, the court says, I'll sign that certificate. Then she says, wait, I actually don't know that I want it. And that is, do you know if Detective Eisenhower is still in law enforcement? I do not know, Your Honor. You don't know one way or the other? I don't know one way or the other. No, ma'am. It was, it was 44 years ago. So I think it's maybe a fair bet that he's retired. I think most of the people in this were retired, but I don't know. But Your Honor, the point is that the petitioner has to make that case in the state court. This court is not allowed under Columbia Penholster to consider evidence that was not before the state MAR court. And when, and I'm not criticizing the choice. I don't know that I would have called Detective Eisenhower either if I were them. I don't know that I would have called Detective Taylor, who was sitting in the room, if I were them. Because he would have had explanations that may not have jived with the idea of Mr. Lai was saying that this was all a police plot. But the problem with that is, if you choose not to call him, that's fine. But then you can't, I would submit, you cannot come to federal court and simply assert that you would have gotten that evidence and that things are as you say. And I want to point to something very important to that, that I think the court needs to pay attention to. And that is Mr. Eisenhower's two reports. Because it's been asserted that one of these reports is a decoy for the other. These reports are on page 1480 and 1484 of the Joint Appendix. And I would ask the court to scrutinize them. One statement in the dissenting opinion in the panel said that crucially, in terms of his evil mindedness on this, that one of these reports was turned over and the other was not. That is, respectfully, that is incorrect. And no one has ever asserted that in this case. No party has ever asserted that one of Eisenhower's reports was turned over and the other wasn't. The petitioner has always asserted, and it continues to assert in the briefing, page 9, page 28, that both of them were not. And if you look at pages 1332 through 36 of the Joint Appendix, you can hear the defense attorney in the state court arguing that exhibits 4A and 4B, the two reports by Van Eisenhower were not turned over. Why does that matter? Well, if one is a decoy for the other, why are neither one turned over? And that doesn't mean it's impossible, but what that means is we can look at the report. Because didn't the original prosecutor testify at the 2008 hearing that he wasn't aware of the reports? And had he been aware, he would have turned them over. And isn't that some indication of materiality? No, no, no, ma'am. I think a prosecutor saying I would turn it over is what we want them to think. But we know that the standard for Brady is not the same as what prosecutors should do in terms of turning over evidence. I will tell you, I absolutely think all of this should be turned over. If a case came today, I would turn every bit of this over. The criminal chief who trained me said, if you're thinking about whether you should turn it over, the answer is yes. It saves you a lot of trouble. But that doesn't make it material under Brady. And the Supreme Court's been clear about that, that that's not the same standard. It's a lesser standard for the constitutional violation. So something can simultaneously be withheld and it should have been turned over, but not be Brady material in the constitutional sense. Now, these reports. It's been asserted that the undated report, which is at 1484, the petitioner has described that, he actually described it in his briefing to you as the creation of a, this is on page 32, the creation of a second undated forensic evidence summary report. Page 1484, that's the report he's referring to. The title of that document is not that. The title of that document is latent evidence in photography. And so, understandably, the report talks only about latent evidence in photography. It mentions the clothing in passing, but you might ask, why doesn't it talk about clothing being tested at the FBI? Clothing is not latent evidence. Now, I'm not asking you to accept that that is the right and true and absolute interpretation. What I'm saying is that Mr. Lau is 50 miles from proving intent. And yet he's asserted it as if it's proven and he's hinged the case on that. And I would agree with his assertion that you don't actually have to prove intent to make a Brady complaint. I don't dispute that. But it does put the case in a different light. I don't dispute that either. And here, I don't think it's been shown. Is it sloppy? I think under any circumstance that this wasn't turned over as sloppy. But is it intentionally withheld demonstrating its materiality? If they wanted to prove that, the time to do it would have been to call Detective Eisenhower and Detective Taylor in the 2008 MAR hearing. They elected, they made the choice not to do that. And that choice is fine, but that choice has consequences. And I would ask if we're discreet. Yes, sir. Counsel, if I could stop you on that point. And I asked this question to your colleague. And you were, I think, talking about it there. On the issue of bad faith, I understand the different views of that. But from a legal standpoint, if we were to find bad faith, what are the implications of that? If we are not to find bad faith, what are the implications of that? Absolutely. So I think it's not automatically just positive either way. You can win a Brady claim without any bad faith. You can lose a Brady claim with bad faith. I think you are expected to consider it. And I don't disagree that it weighs on materiality. I don't think that because an evidence officer chose to withhold something which is automatically material, I think that the court has to make its own judgment of that. But I'm not asking the court, if you do think it was intentional not to consider that as a factor. But as you do that, I would ask you to also consider the actual records that are being described by the petitioner and ask whether those are actually accurate, the descriptions that are given. Because if you look at his report of 1484, it doesn't really seem like it is any kind of decoy for the much different report that is summarizing all of the evidence in the case and lists all the evidence that was taken. And so I just want that point to be very clear that it's not enough to come and just describe these reports inaccurately and say, therefore, he engaged in perjury and bad faith and hid these intentionally. There are a lot of reasons that this may not have been turned over. Just follow up. If I could just follow up on that. I understand that with respect to perhaps the reports. Does the way in which the evidence was turned over, in bits and drabs, relate to bad faith in addition to the report issue? What's your position on whether it does or does not? And, Your Honor, if I may clarify, do you mean bits and drabs in the 2000s? You mean 2005? Or do you mean back in the day in 1976? I mean, post afterwards, as some came out, then other came out, and it seemed like the longer things went on, more evidence was coming out. I don't think that that really gets the case. I do think that you could consider that, I think, in terms of modern day bad faith, but it's not present here. In fact, the efforts that were undertaken, and you can look at some of this in the transcripts that are in the record, were extraordinary. There's a letter from the FBI explaining everything they did trying to find these records, and I would describe that as extraordinary. I would describe that as no holding back. They searched for alternate names for Mrs. Boss because they were afraid maybe their searches hadn't found it. The general counsel was driving down the different laboratories, and they searched, for example, they searched the doctor's storage unit that had his old materials in it. They searched everywhere, and so the idea that things were turned over sort of intentionally held back and drabs, that was a concern the prosecutors had of being accused of that at the MAR hearing, and you can actually look at that near the end of the hearing  the entire Concord Police file into the record, and it's specifically, the prosecutor is saying, and the defendant is objecting, by the way, and the prosecutor says, you know, I don't want them to be here in five years and then now say the target is we didn't get this page or that page. The fact of the matter is we're not going to leave that door open so they can shoot at something and call it the target. They entered the entire Concord Police file, and as to the fingerprints in 2015, we don't know all the details, and I think the petitioner does have some burden since he was given the entire, and they had the option, they went through and they posted some things they wanted to see from that physical police file. This is after the trial that I'm talking about during the post-conviction. I think there's some burden for them to demonstrate that they actually didn't have them because they may have seen them that day and not flagged them, and I'm not trying to say what happened. What I'm trying to say is there is not evidence of bad faith post-conviction here. The efforts undertaken by the DA's office, by the CTV, by the FBI, I would submit to you are thorough, and if they have trouble finding 40-year-old records, hard to find 40-year-old records. Judge Richardson here. Will you respond to what I believe Judge Thacker's first question was to your colleague about why Wetzel doesn't apply in this context, and I understood your colleague's response to be that the materiality finding, the no-impact finding by the MAR court was infected or implicated by the favorability finding or lack of favorability finding by the MAR court, and as a result, that's why Wetzel doesn't apply. That framework does not apply. Right. Can you respond to that question in your colleague's response to it? Yes, sir, and I think I disagree with him in a couple of distinct ways. The first is Wetzel didn't talk about prongs. It didn't think that it came down to which prong it comes first in terms of the Brady analysis, but I read it to say that exactly what happened here happened there, that the state court made an error as to favorability. It found that additional impeachment of a witness on a different topic but they'd already been heavily impeached was not favorable. Well, that's wrong, but then the court said, at any rate, you have this other dispositive finding that it doesn't really matter what you found about that other thing because there's no Brady claim categorically, and this case fits that, but the broader point I want to make is that I don't think this is a Wetzel case. I mean, I think this case is a lot like Wetzel, but Wetzel is not a line of cases. It's a good analogy, but this is Richter. This is a Richter line of cases. Wetzel was a GVR by the Supreme Court. They didn't even hold briefing and argument on it. They thought it was clear enough. It was 6-3, but they thought it was a clear enough principle, and the principle is this, and this is from Richter. A habeas court must determine what arguments or theories supported or could have supported the state court's decision. Then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding and a prior decision of the court. That's Richter. Wetzel's an application of Richter. So is this case. So what arguments or theories supported the state court's decision? Well, in paragraph 14, it is that when you look at this evidence, which it had described and made factual findings on, that all of it together, cumulatively, would have had no impact on the trial. That finding is dispositive because even though the court earlier had stated the Brady standard incorrectly, I don't dispute that, there is no, it doesn't matter whether it even stated the Brady standard because ultimately there's only one outcome under Brady if it would have had no impact on the trial considered cumulatively, and then this goes to all of the cases, Sexton, Viscoti, where the Supreme Court has said, you're supposed to look, federal courts, for reasons to support the state court's judgment, not the other way around. And I think that one is more than sufficient here because the finding that these items considered cumulatively would have had no impact is not objectively unreasonable. In fact, I would submit to you that it is reasonable and we've only talked about some of them, but the testimony at the MAR hearing, which is what this should be based on, is testimony, was that suspect hairs are found at every scene, practically every, she said she sees them constantly, it is almost routine. She said, and this is Agent Remy at the MAR hearing, page 1199, almost every case I've worked on has hairs that we can't identify to either a suspect or a victim. The hair could have been there for years. It could have been from a person who never entered the house through second-party transfer. She talked about- Excuse me, this is Judge Harris. I have a question about going back to your answer to Judge Richardson and what we do with this cumulative effect determination. I'm troubled by what we've already referred to as the preceding paragraph incorporated by reference, applying the wrong standard of review, but I'm even more troubled by the subsequent paragraph where the MAR court, in discussing the cumulative effect in particular, says that the defendant has failed to prove by a preponderance of the evidence that the cumulative effect would have been material. So I am left with no confidence at all that at any point this MAR court looked at cumulative effect without applying the preponderance standard. So what should I do then? I think it's a fair point, Your Honor, but even that sentence there alone is not technically incorrect. Now, I'm not trying to cut it too thin on that, but you do have to prove, whatever you're proving at the hearing, you have to prove by a preponderance and you have to prove that it was material. Now, what you prove by a preponderance in terms of materiality is not a preponderance. It is a reasonable likelihood. The Supreme Court has described that difference as slight. They have said that it would only matter in the rarest of cases. And so that's the first point. The second point is you still, no matter what, have to defer to factual findings that are not objectively unreasonable. And the court talked in pretty great detail about those findings, and I would ask the court to consider a couple of specific ones. It talked about the shoe print as part of a compelling case, and it talked about the evidence presented at the hearing about the shoe print. That's on page 1355, paragraph 32. It talked about what I just said about the hair report it made findings on. It's paragraph nine on 1357. On the clothing, 1358, paragraph nine, it reviewed those same things that I discussed earlier about how you wouldn't expect this item, these items to have adhered to leather. And then it talks about other things as well in the paragraphs around that. I want to cut that a little short and just say that I think reasonable jurists could agree or disagree with its decision on that. And what the Supreme Court has said, then that's the end of it. Then it stands. And then I would also add that we maintain that even if you looked at this under DeNovo review, you would still, first, you would have to defer to any factual findings that the defendant has not shown a wrong by clear and convincing evidence. And then second, you would still, I submit, I think the right answer under Brady is that they have not met the relatively high standard of showing a reasonable probability that the jury would not have convicted, especially when you account for the fact that a lot of this was either discussed, for example, in closing statements, which aren't evidence that they do affect the jury, or I think equally importantly, you would have had experts testify to exactly what you see in the 2008 MAR hearing about how this evidence is not that surprising on an uncontrolled scene. Okay, were the hairs and the fibers and the fingerprints discussed in closing arguments? No, Your Honor, but the white paint on the jacket, which I would submit to you is probably the best mileage to get out of these reports, was discussed, and it was discussed in a very effective way, and in a way that I would submit to you. So the very skilled defense attorney did a whole, and I won't read the whole litany, I assume my red light is on. He talked about white columns, white drains felt, white siding, and not a trace of white paint on them, and the prosecutor agreed. So that was an uncontested fact. No one testified to that, but it was uncontested. And the Supreme Court has talked about the evidence cumulative to things that are uncontested. The defense jury said, well, I'd have been a lot stronger if I had an SBI report in my hand. He did have the district attorney agreeing in closing, which I think is pretty strong. But remember, if he had put in that SBI report, he would have gotten the testimony of aging tone, explained to the jury why it didn't matter, leaving you wondering if maybe the best strategy was exactly what they did. Okay, Mr. Rubin, this is Judge Keenan. I'd like to follow up on your comment earlier in response to my question that the second report was labeled latent evidence, and that's why it only listed shoe prints. Aren't fingerprints also latent evidence? Yes, ma'am, and it talks about those as well. Okay, and what do they say? What does the report say regarding that? And I'm checking it to make absolutely sure that I'm right to you. Process for latent prints of value. So I'm reading now from page 1484. The crime team was processed for latent prints of value using conventional methods of dusting and lifting. Numerous prints were lifted, with some being eliminated by this officer as those of the victim, Mrs. Boss. Note, Mrs. Boss prints. It goes on. It's more just informational. Okay, so that was in the second report as well as the evidence regarding the shoe print. That's right. Yes, Your Honor. It's on page 1484 so that you can see it for yourself. Okay, thank you. And if I may, and I recognize I'm over my red light. If I can add one final point. Mr. Rubin? Mr. Rubin, Chief Judge Gregory, let me ask you a question. You talk about there's no chance, I think the court said that this would have made a difference. At the closing argument of the state in this case, they said the victim's testimony is not only accurate, but totally consistent with every piece of physical evidence existing. That's what the prosecutors told the juror. That was not true. Is that correct? That's a yes or no answer. That was not true. Your Honor, I... That was not... Nope, nope. Was that true? Your Honor, I don't think it was fully accurate, but if I may explain. The answer is no, it wasn't. Your Honor... And that's what... Wait, wait, wait, counsel. We're talking about justice and looking back some 44 years ago. The prosecution told the jurors the closing, the piece de resistance of a trial it is consistent with every piece of evidence existing. What about the pubic hair? What about the hair from his head? What about all those things not disclosed? To say to the juror it is consistent with every piece of evidence that's in existence. That's what... Isn't that appalling to justice? Your Honor, I just... I need to make the point. That it was... No, just answer your question to my question. Is that appalling to justice? I don't think so because I can put it in context for you, and if I may. When he said that, it remains true that all the physical evidence in this case is consistent with his guilt. I would take a very different view of this case if it wasn't. Because you had testimony to explain this, that suspect hairs are routinely found on scenes. So the existence of a suspect hair is not exonerating. I'm not saying it's not favorable. I'm saying it's not exonerating. It is consistent. A scene that looked like this would be consistent with Mr. Long committing the crime. The jacket without any fibers at all is consistent with him committing the crime. All of the evidence... There has been nothing shown that actually exonerates Mr. Long. I would take an incredibly different view of this case from a justice standpoint. If there were... Mr. Rubin, did you... Excuse me, Mr. Rubin. Did you just say that there's a pubic hair that didn't match? There weren't any pubic hairs that didn't match. But you said it's totally consistent with every piece of physical evidence in existence. And that's why I tried to make the point that I think I wouldn't have stated it as strongly if I were him. And I think maybe he wouldn't have. I don't dispute that. So you would have said the same thing. I think I said I wouldn't. I would probably have watered it down. But I would still say, and I'm saying to you today, that it is a fact, even today, that the evidence at that scene was consistent with the evidence as we know it today. There are aspects of it that detract. You just changed what he said. He said, in existence. You asked me... I think I thought Your Honor asked how I would put it, and I put it that way. But Your Honor, I guess what I'm trying to say is it's not some sort of a bald-faced, totally incorrect statement. I think it's... The evidence here is consistent. It is consistent. It could be more consistent. The shoe print could be an actual tread match for that specific shoe. But the fact that there's a class match of the shoe is consistent. The black jacket that the witness identified is consistent. Judge Harris? Yes, I'm on. I don't know what happened. All right, thank you. Judge Motz? Thank you, Mike. Judge Motz? Thank you. I didn't mean to interrupt you, Judge Gregory. No, no, I think I've got the answer to my question. Okay. Mr. Riven, I just have one question, and I don't know... I would just like to... I'm going to ask your colleague on the other side, too. So this trial took place 44 years ago, and in the Maher court's opinion, it seems to rely... The court seemed to rely pretty heavily on the fact that things were different then. There were different legal practices, different standards at the time of the trial in reaching its conclusion. Do you embrace... something that we should consider when we're determining whether there was a fair trial here? I think, Your Honor, I think it would depend on which specific things. So, for example, I think the open file discovery is certainly not how we would do it today, but I don't think that relieves... I don't... It doesn't relieve a prosecutor of the obligation to make sure evidence is turned over, and I'm not suggesting that. Because it was done in a less sort of formal way than it is done today, that, therefore, it's fine. So if that... It may help me, if I might, to understand, you know, if there are specific things that it referred to back then. No, I understand that. And I was just really asking a philosophical question. That seems to be something that ran through the Maher court's opinion. Yeah. Which, frankly, seems to me a little more worrying. And I just wondered if the state also shared that view. You know, this trial took place 44 years ago. There are lots of things that have changed in the world and shouldn't be judged under current standards. I think that the changes in the way juries look at things, for example, and the importance of certain evidence, like DNA evidence today versus back then, and things like that, I do think that's an appropriate consideration. I don't think there's an idea that practices were looser back then, and, therefore, it's okay. I'm not going to suggest that that would be the right thing to take from it. But I do think that the Brady question is whether the outcome would have been different, right? A reasonable probability that it would have been different. So you aren't necessarily looking back then. And I think it doesn't tolerate sort of ignoring imperfections in the process back then, but it does respect that you're looking at whether it would have been different in 1976. It was a philosophical answer. I'm not sure it was a very concrete one, Your Honor. Judge Diaz has a question. Mr. Rubin, getting back to Judge Gregory's point about what the prosecutor said during his closing argument, isn't part of the problem here that the prosecutor himself was laboring under a misapprehension as to what the state of the physical evidence was because he himself had not been made aware of these forensic reports? I think that may well have contributed to it. Mr. Bowers, who was the second chair, testified at the MAR hearing, and, Your Honor, you're right. He said, I didn't know about these. I'm not suggesting that that's helpful to you because I think that's the problem with this case, right, is that these reports, including the physical testing, was not presented. And so as a result, the prosecutor was then led to believe that and could legitimately argue that all of the physical evidence was, in fact, consistent when it clearly was not. And I take your point, Your Honor, and I'm not saying that's a good fact for us either, but I would say that I would ask you to look at that entire closing in context because a lot of what, and I'm not saying, I'm not trying to negate what he said there, but a lot of what he was also talking about when he talks about the evidence is describing how it conforms with what Mrs. Boss described about the scene that night. She described everything about the house and where things were and this got knocked over and the TV was on and this light was on and the officer that got there 20 minutes later said that was exactly it. Now, he's also talking about the other evidence that this is a prosecutor who, in rebuttal, acknowledged that there was no paint on the jacket. So he knew, he didn't disagree that there was no paint on the jacket, but still thought that it pointed, that this evidence still pointed towards guilt. And for the reasons I've explained about the expert testimony, about the effect of how items adhere to leather, that's why, and I'm really, I'm not trying to sort of move past Chief Judge Gregory's very good point about justice here, but I am trying to say that the statement, this evidence is, in fact, consistent with guilt. It is not something that is, that is actually like you could not have committed this crime because this piece of physical evidence proves you didn't. It weakens evidence that is inculpatory, I don't dispute that, but it is still inculpatory that when she identifies him with the jacket and the gloves and the toboggan on April 25th and those items are found on May 10th after she identifies him not wearing those items and his shoe print being a match, that is physical evidence and it does correspond. Even if the weight of that can be reduced by reports that should have been disclosed, that does correspond, that is evidence, it is significant, especially when you put that all together. Judge Wynn has a question. I just wanted to follow up somewhat on Judge Mott's question and the answers that you give in terms of the evidence. You've indicated on several occasions, particularly with regard to the detective, you didn't say it was false at this time, and she said, well, he was mistaken or inaccurate. When the prosecutor argued at the end, you didn't say, oh, that was not right, it was inaccurate. And I wonder in light of Judge Mott's question, which I think goes deeper than just the practice, the procedural practice of what happened in court, we're talking about the realities of circumstance 44 years ago in North Carolina, in Concord, North Carolina, which I've lived all my life. We're talking about the reality of many types of prosecutions and circumstances in which law enforcement did certain things that were certainly not, they were a little bit more inaccurate. They were deliberate in what they were doing. And here, the zeal to prosecute 44 years ago with evidence that clearly, even then, should have been disclosed. And the question then becomes up as to materiality. Well, we've got so much other stuff here. Maybe then we're going to excuse this sort of conduct. And I understand that we cannot put ourselves back in 1976, you know, in 2020. But the reality is when we apply 2020 arguments to evaluate what happened with the jury in 1976 under these circumstances, we go back to Judge Mott's question of how do we view 1976 and the realities that we are not being so forthwith in discussing here today, because we just don't discuss things like there were black men who were being prosecuted wrongfully, and we know in great numbers. There had been lynchings far beyond then, and it was not over in 1976. It was continual. And yet you have evidence here that prosecutors had evidence that clearly any defense counsel in the world, not only in 1976, but since the history of this country, would have wanted or needed and should have been supplied, as later indicated by Brady, and yet they did not provide it. And then to get on a stand and make statements that are patently false, characterize them as inaccurate as you want, they were just patently false statements, coupled with the, just as you say, the totality of the circumstances in dealing with that era. That's the element of concern we're talking about when we say 44 years ago. And then I'll end with one last thing. When we look at these cases, I often wonder why is there such zeal not to look at evidence and make that determination now? What is it about us that want to prosecute and keep people in jail when we know evidence may exist that might lead to a different conclusion? Why is that so offensive to us now that we want to go and protect activities that happened 44 years ago, and it may come out to the same result? But what is the harm? And in the end result, he spent 44 years in jail, even if he was to get out. That's a significant punishment. So when we look at these circumstances, I just don't understand why we wouldn't take a look at it. And what is the problem with having more discovery? And particularly when we know, like the fingerprint information here, as you say, that is latent evidence that ought to be considered. We didn't have, and by the way, I think there was some semen, somehow it disappeared. Did it not? I don't know if it ever came up, but as evidence it was in the police's custody, the semen, which you didn't have DNA back then, but you surely did have tests, that could have led to an exoneration if certain tests from that had indicated such, or at least strong evidence that he did not do it. And yet it disappears. But we, in 2020, we sit here with our own pre-notions of how evidence should be viewed, and we said, well, we're going to just give the benefit of the doubt in 2020. But we know what happened in 1976. I mean, it's very difficult for the conscience to even accept that as an argument. When it's so simple, all we're saying is just look at the evidence. No one's making a determination today. Just look at it. What's the problem with that? You know, I don't have a problem with that. And I'd like to explain, I mean, there's a lot of things that Your Honor just said that I would like to address and agree with. Frankly, almost all of it. This is, this case, I said at the beginning, it does deserve a hard look. Our system decides that that hard look should primarily occur in state court, and it did occur in state court. The NLR hearing, in this case, we talk about it as a hearing, it was essentially a bench trial. It was three days long. I think the transcript may be longer than the trial transcript. The judge, Judge Feinauer, he took extraordinary efforts to make sure that the defense was able to access evidence that they thought might be available, and there were searches done, and there were searches of storage units, and there were dozens and dozens of man hours spent searching records and finding things. And all of that is exactly right, and I agree with you. I don't want to get that narrow point away from the broader point, that I'm aware of that context. I was not alive during this time period, but I am aware of it. And I don't want the court to think that we haven't forgotten it. Well, I'm gonna, you know, because we could go on, and I do appreciate your candor in acknowledging that, you know, what I said was essentially true and remains true. The problem is, we use procedural rules, and we use our own court-made rules to what Judge Gregory alluded to, avoid justice. When did justice leave the court? So that every time we get a chance, we can figure out some legal maneuver to not address what every person in the heart has some sort of feeling, oh, something went amiss back then. But we have some rules that will let us just do away with this and just keep him in jail. What's the harm? And it's gone on, and we're going on with our lives. That's the question. When did justice leave the process such that we let our rules blind us to the realities that we all can see? Judge, thank you. I will tell you that in this case, I don't think it has blinded us. And I do think that law and justice have a role together. And it's particularly important because either way you can have injustice in a case like this. If a man who was rightly convicted  his conviction is overturned because of sort of a freestanding feeling of justice, that's not law. You know, the Supreme Court building doesn't say equal justice. It says equal justice under law. But I will tell you that if we looked at this evidence, and I will just level with you and say when I first opened this case, I was worried about whether I would be able to defend it because I will never stand in front of you, whether it's on screen or in person, I will never stand in front of you and defend a conviction. In the interest of time, I really want to ask you one last question. Because when we look at our rules and all the justice, what would happen if we did allow it to go back and have this evidence? It seems that he, you know, probably it could go either way. But I mean, how does, how is the government harmed by an individual where we clearly had government agents to do something wrong? How are you harmed by just doing it? And I think our response is, I'm not going to tell you that that would end the world or something. I'm not going to tell you that. But the rules, he doesn't meet the standard under it. And it's not because therefore he shouldn't get a hearing. It's that that hearing already happened in 2008. And with the exception of the fingerprints, which may or may not have been known then. Oh, they didn't have to tell us. They said they didn't have it. And in fact, there were fingerprints. In 2008, we know that. That was only found out in 2015. And Detective Eisenhower's report that was turned over in 2005 talks about all of them. But I want to set the fingerprints aside for a second and for a moment, because just to set it aside and say these other things that we're talking about. There was an evidence here. It's hard to materiality in 2015 something as significant as fingerprints come up when this evidence is what it is. I mean, that's hard to do. But I don't think we needed to belabor this. I think your point is well taken in terms of the legal position you've taken. But I wanted to be clear in terms of the justice aspect of it. That much is there. And sometimes the rules can allow you to have an injustice. It seems like the rules are deliberately written such as to allow for an injustice that can be cured so easily. This is not a difficult thing to send it back and let this trial judge do this job and just give us the answer. At the end of the day, we go back and we recognize the principles on which this country was founded. And that is liberty means something. You don't just take away a person's freedom easily. It means something. But somewhere along the line, the whole aspect of, well, we just want to make sure that law enforcement gets credit and we trust them and we want to keep up the integrity of the system trumps liberty of individuals. That we don't treat people this way in our system. We give them a fair day in court and if they're found guilty, we give them punishment and we require them to serve. That's all I'm saying. But I think we could go back and forth on this. And I don't know if there's an end to this conversation. So I think we probably need to. I don't have a question there. I just wanted to say that. I appreciate that. Thank you, Judge Wynton. Thank you. Thank you, Count. Thank you, Count. No further questions. I will ask you to look at the totality to every page of this record and then I would submit to you that you should affirm the judgment of the district court. Thank you. Thank you, Mr. Rubin. Lyle, you have some time. I would like to begin my first addressing Judge Wynton's statement to say the state today asked you to take the benefit of doubt about evidence that in 1976, it didn't even give the benefit of the doubt. It would not be able to argue about the strength of this evidence had it been revealed at the trial and the jury had the information necessary to evaluate the statements and evidence presented by the state. I want to make six quick points that I think I can do quickly. I first want to address Judge Mox's question. If we were going to look back in 1976, we have to look back at what Judge Wynton has described. This was a case tried by an all-white jury after law enforcement officers personally went through the master jury rules and struck people. At the time of his trial, the jury chairperson testified that he can't say who it was that was struck from those jury rolls because he had lost the list that law enforcement officers went through. And one was tried by an all-white jury. The council testified in this case that they had, because of the racial tension in Concord, they had determined that they should seek a change of venue, but then decided against it because of the Klan activity that existed in the surrounding counties. But on the points that I want to make, so that would have to be considered if we're going to look back at the context of 1976. But on the points directly to the state's argument, first, this is not a Richter case. Richter is for cases where there's not a reasoned state court opinion and there's a reasoned state court opinion here. You have to look at the reasoned state court opinion. Wilson v. Sellers, decided by the Supreme Court in 2018, makes that clear. The hair evidence that was suppressed is very meaningful because it fits the description that was described by the victim in this case. It was from a Negroid or Mongolian of origin. The state doesn't want that to be recognized. I was accused of being 50 miles... I'm not going to say accused. I'm sorry, Phil. That's the wrong word. I apologize. It was said that I was 50 miles from proving intent. The state has no answer for why the rape kit disappeared and there's no record. The state has no answer for why the SBI records, the forensic test in these cases, were not in the files of the Concord Police Department. At some point in time, these records have been removed and it's reasonable to infer that they were there at one point in time. On Detective Eisenhower's testimony at the state MAR hearing, Detective Eisenhower wasn't called... Counsel, can you just respond to the point you just made? The decision by your client to not seek testimony from the Concord Police Department about the very things that you want us to make assumptions about or inferences about during the 2008 hearing. You had the ability to call those officers and I don't mean you personally, but whoever was representing your client at the time. And yet now, having not called them, you want us to create an inference that you could have gotten through testimony. Well, why should we consider that? Two responses. First, Van Eisenhower had already demonstrated that he was happy to perjure himself or willing to perjure himself in this very case. So what is the purpose of putting on someone to explain things? The state assumes that he would have testified truthfully when the evidence suggests that that wouldn't be the case. Additionally, the state had the very opportunity to call him in rebuttal to provide the explanation but chose not to. So the state wants to put that on Long to give someone who's already perjured themselves the opportunity to testify when it could have done the very same thing it says that Long didn't. The other thing is the state points to the testimony of Sergeant Taylor or Detective Taylor on 375, but I point the court to 335. On page 335, Detective Taylor is being questioned and he says, I didn't match them. Speaking of the matches and using the term match as a verb to compare, then they were not matched. To my knowledge, they were not matched. In other words, the matches you got out of the car do not match with those found at the scene of the crime. I can't testify to that. He could testify to that because they had the reports already in hand that demonstrated that those matches did not match. On the identification in the black leather jacket, I want to make a couple points. First, the pre-identification description differed in one other material way. It never described facial hair of an assailant. The first time facial hair mentioned which Long had didn't occur until trial. In her report, the first description of Long and it's on page 1428 in the record, she described her assailant as wearing a dark leather jacket, not a black leather jacket. The courthouse identification, Long was wearing a dark leather jacket. It was a dark brown leather jacket. In the subsequent photo identification where all she had to do is identify the same person from 20 minutes earlier that she saw, he was wearing a black leather jacket, a dark leather jacket in both. There are no hairs similar to Long that were found in the toboggan. It's further not linked. The black leather jacket was looked under a microscope by the FBI. Had it bore markings of the crime scene, scratches, the victim testified that she scratched so hard against the jacket, she tore her nails back. It would have been included in those FBI reports. It was not because it was not the jacket the assailant was wearing because Long is innocent. The final thing I want to say it's a point about justice. The state says it took a hard look in this case. The hard look meant it opened up the book. It flipped through the record. It didn't call Detective Eisenhower. It didn't conduct a single investigation as to why these investigators in this case, why they hid this evidence from the prosecutor and defendant and Mr. Long didn't have the benefit to use it at trial. If the state was interested in justice, this is a problem with the culture of the Attorney General's Office in North Carolina. If it was interested in justice, it would have began an investigation into the conduct of these officers to determine what went wrong here. It hasn't begun that process because it looked through the record and it decided as Judge Wynn contested what procedural rules can we put in place here to bar achieving justice in this case. No jury on the strength of this evidence, no reasonable juror would convict Long today and we ask that the district court be reversed. Thank you. And Mr. Lowry, important that the question that when the prosecutor said consistent with all evidence existence, he really thought that's what existed. He did think that because these officers' actions demonstrated that they didn't trust the prosecutor to have this information and it also bears on the question, would we even have had a trial if the prosecutor had this information? Would they choose to go forward? And I contend that the MAR provides a partial answer to that because the prosecutor testified in the MAR as I mentioned earlier, it wasn't an if, it was an automatic. They would have tested the rape kit had they been aware that it existed and had they tested that rape kit if they were aware it had existed, it would have demonstrated that Long was not the individual who committed this crime. Thank you, counsel. I appreciate your arguments and both Mr. Lowry and Mr. Rubin, thank you so much for your patience and your diligence and your focus on your arguments. Regret to say, as you well know, that we can't do our normal tradition and it's coming down to shake your hand, but please know whether by video or telephone, our handshake and our gratitude is just as thorough and heartfelt and we really appreciate your arguments and your assistance in us resolving this case. Thank you so much. Thank you, I really missed the opportunity to shake each of your hands and I appreciate your consideration. Thank you.
judges: Gregory,Wilkinson, Niemeyer, Motz, King, Agee, Keenan, Wynn, Diaz, Floyd, Thacker, Harris, Richardson, Quattlebaum, Rushing